IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**HARVEY HOFFMAN**,                    §
                                       §
               Plaintiff,              §
                                       §
v.                                     §      Civil Action No. **3:12-CV-3781-L**
                                       §
**BAYLOR HEALTH CARE SYSTEM**          §
**D/B/A BAYLOR MEDICAL CENTER**        §
**AT WAXAHACHIE**,                     §
                                       §
               Defendant.              §

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the court is Defendant Baylor Health Care System's Motion for Summary Judgment (Doc. 17), filed July 25, 2013.  After considering the motion, response, reply, summary judgment evidence, record, and applicable law, the court **grants** Defendant Baylor Health Care System's Motion for Summary Judgment (Doc. 17) and **dismisses with prejudice** this action.

**I.      Factual and Procedural Background**

Plaintiff Harvey Hoffman ("Hoffman" or "Plaintiff") brought this action against Defendant Baylor Health Care System d/b/a Medical Center at Waxahachie ("Baylor" or "Defendant") on September 18, 2012, alleging claims under the Age Employment Discrimination Act ("ADEA") and the Americans with Disabilities Act ("ADA").  Plaintiff contends that Baylor discriminated against him on the basis of age and disability when it terminated his employment on November 3, 2011, after an incident that occurred on October 28, 2011, that put a patient's safety at risk.  Hoffman contends that although two other employees were equally to blame for the incident, he was the only one disciplined.  Hoffman asserts that he was treated differently because he is older than the other

**Memorandum Opinion and Order - Page 1**

two employees and has a tremor in his right hand. Plaintiff seeks damages in the form of backpay and front pay, including benefits, liquidated damages, compensatory damages, and punitive damages. Hoffman also seeks compensation for attorney's fees, expert fees, court costs, prejudgment interest, and postjudgment interest.

On July 25, 2013, Baylor moved for summary judgment on both claims. With regard to each claim, Baylor contends that Plaintiff cannot establish the fourth element of a prima facie case of discrimination. In addition, Baylor asserts that, even if Hoffman can establish a prima facie case, he cannot establish that its legitimate nondiscriminatory reason for terminating his employment was pretextual. Baylor contends that it was justified in firing Hoffman because, on October 28, 2011, he failed to follow written safety protocol for Magnetic Resonance Imaging ("MRI") when he conducted an MRI on a patient with a pacemaker that could have caused the patient's death and was previously warned about failing to carefully review patient MRI Patient History and Screening Forms ("MRI Screening Form") before conducting an MRI.

Hoffman, in response, contends that he has established a prima facie case and raised a genuine dispute of material fact as to whether Baylor's decision to terminate his employment was a pretext for discriminating against him based on his age and disability. For support, Hoffman relies in large part on his own declaration. Baylor objects to certain statements in Plaintiff's declaration as conclusory and speculative. For the reasons herein explained, the court determines that no genuine dispute of material fact exists regarding Hoffman's age and disability discrimination claims, and Baylor is entitled to judgment as a matter of law on both claims.

**Memorandum Opinion and Order - Page 2**

## II.      Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).  Mere conclusory allegations are not competent summary

judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.    Undisputed Facts[1]

Hoffman worked for Baylor from January 23, 1989, to November 3, 2011. Hoffman was employed as an "MRI Technologist II" ("MRI Tech") at Baylor's Waxahachie, Texas location from September 2001 until his employment was terminated on November 3, 2011. To entice Hoffman to accept a position at Baylor's Waxahaxie location, Ronny Rose ("Rose"), the director of radiology, offered him a senior technician position in 2000. Def.'s App. 29. Hoffman was 59 years old at that

---

[1] Unless otherwise stated, the facts set forth herein are undisputed.

**Memorandum Opinion and Order - Page 4**

time.  Hoffman suffers from a tremor in his right hand and was 70 years old when his employment

was terminated.  Hoffman was terminated after he performed an MRI on a patient with a pacemaker

("Patient X") on October 28, 2011.  A pacemaker is considered a "contraindicator" or factor that

precludes a patient from receiving an MRI.  Patients with pacemakers cannot have MRIs because

the procedure can cause the pacemaker to malfunction and result in the patient's death.  Fortunately,

the patient who received the MRI performed by Hoffman on October 28, 2011, was not harmed.

At the time of the October 28, 2011 incident, Baylor had in place written safety protocol and

patient screening procedures for MRIs.  Baylor also had a written job description for the MRI Tech

position.  Hoffman admits that the job description applied to him and that he was responsible for

complying with Baylor's safety policy and procedures for MRIs.  Def.'s App. 25-26.  As an MRI

Tech, one of Hoffman's primary responsibilities was to review the patient's chart and evaluate the

patient's history and symptoms for the procedure's clinical criteria.  *Id.* at 36 Hoffman was also

required to communicate with the patient or patient's family to verify whether the patient had any

surgically implanted electronic, mechanical or metallic objects and whether the patient has been

"cleared" by a radiologist for "metallic object(s) by x-ray and/or CT."  *Id.* at 41-42.  Baylor's safety

procedures prohibit an MRI Tech from performing an MRI when the patient has not been cleared;

the patient's chart indicates the presence of an implant that was not considered "safe"; or the MRI

Tech discovers that the patient has an "unidentified or questionable implant or foreign object."  *See

id.* 41-42.  If a patient has not been cleared, the MRI Tech is required to cancel the MRI exam.  *Id.*

42.  The MRI Tech is responsible for ensuring that a patient has been cleared for an MRI before

performing the MRI, although nursing staff at Baylor's Waxahachie location would frequently assist

by filling out the MRI Screening Forms for MRI inpatients, that is, MRI patients admitted to the

hospital.

Patient X was admitted overnight into Baylor's emergency room and was unable to communicate with the hospital staff. Staff nurse Danny Stokes ("Stokes") was on duty when Patient X was admitted and was assigned to her care. Patient X's chart indicated that a physician had ordered an MRI. Based on information contained in Patient X's chart, Stokes filled out the first page of her MRI Screening Form and noted that she had a right hip replacement and a pacemaker. At the end of his shift, Stokes told the incoming day nurse Paula Zavala ("Zavala")[2] that he had started the MRI Screening Form for Patient X but had not completed it. Stokes also advised Zavala that Patient X had a pacemaker. Zavala completed the second page of the MRI Screening Form and checked the "YES" column indicating that Patient X had a pacemaker and hip replacement. After completing the MRI Screening Form, Zavala attached it to Patient X's chart. Zavala also wrote on a communication board in Patient X's room that she had a pacemaker.

Around 10 a.m. on October 28, 2011, Hoffman telephoned the nurse's station in the area of the hospital where Patient X's room was located and spoke with unit clerk Debra Watkins ("Watkins").[3] According to Hoffman, he inquired whether Patient X had been cleared for an MRI, and Watkins confirmed that she had been cleared. Subsequently, Hoffman and radiology file room clerk Rodney Summerville ("Summerville") went to Patient X's room and transported her and her chart to the MRI examination area. Before transporting Patient X, Hoffman spoke with Zavala, who explained that Patient X was unable to speak or move on her own. Zavala did not mention that Patient X had a pacemaker.

After Hoffman left with Patient X, Zavala telephoned Patient X's daughter between 10 a.m. and 10:15 a.m. to ask her to bring a medication for her mother that Baylor did not have on hand.

---

[2] Zavala was 49 years old when Hoffman's employment was terminated.

[3] Watkins was 55 years old when Hoffman's employment was terminated.

During the conversation, Zavala explained that Patient X would not be going home that day because she was having an MRI. The daughter advised Zavala that a doctor in Dallas had told her that her mother was never supposed to have an MRI because of her pacemaker. Zavala immediately hung up the telephone, called the MRI examination area, and informed Hoffman what Patient X's daughter had told her. The MRI scan on Patient X, however, had already been completed. Hoffman testified in his deposition that he looked at the MRI Screening Form that was attached to Patient X's chart and noticed the reference to a hip replacement, which he concluded was not a problem, but overlooked the notation at the top of the MRI Screening Form where a check mark in the "YES" column appeared next to pacemaker. In his response to Baylor's motion, Hoffman acknowledges that he "failed to check the form to ensure that the patient was cleared for an MRI scan." Pl.'s Resp. 9.

Immediately following the incident, Zavala notified the nursing supervisor on duty, presumably Carol White ("White"), who was covering for her manager, and intensive care unit manager Cay Kubin ("Kubin") as to what had occurred.[4] White, Zavala, Watkins, Hoffman, and Kubin all gathered at the nurse's station in Two North of the hospital where Patient X's room was located and discussed what happened. Hoffman and Zavala both blamed each other for the incident.

Hoffman's immediate supervisor Rose was not available at the time, so Hoffman told radiology supervisor Angela Smith what had happened. After learning about the incident, Rose informed human resources manager Marcos Ramirez ("Ramirez") that Hoffman had performed an MRI on a patient with a pacemaker and sought guidance from Ramirez regarding the appropriate disciplinary action. Ramirez investigated the incident and concluded that Baylor's protocol required

---

[4] It is undisputed that Rose was not Zavala's or Watkins' supervisor. Based on Zavala's deposition testimony that White was covering for her manager, it does not appear that White was Zavala's supervisor either, but it is unclear whether White supervised Watkins.

Hoffman, as the MRI Tech, to review the MRI Screening Form for contraindicators, such as a pacemaker, before performing an MRI on a patient.  Ramirez further concluded that Patient X's MRI Screening Form clearly indicated the presence of a pacemaker and that Hoffman failed to review the MRI Screening Form before performing the MRI.

Ramirez also reviewed Hoffman's personnel file, which included two prior warnings for failure to follow MRI protocol.  On April 21, 2008, Hoffman received a verbal warning that was documented and signed by him for failing to "[r]eview contrast form for contraindications." Def.'s App. 56. Hoffman was advised in writing that improvement was needed as a result of an incident in which he performed an MRI on a patient with renal problems:

> Areas Which Need Improvement: *Attention to orders and contrast screening form[.] Notified by ARA that patient had MRI contrast exam with history of renal problems indicated on screening form.* Patient was found to have elevated creatinine. Contacted physician and reported Midas event.
>
> Discussed with Harvey on April 21, 2008.

*Id.* (emphasis added). Six months before the incident with Patient X, Hoffman was warned again in writing on April 6, 2011, about failing to follow "MRI safety procedures regarding patient history form."  *Id.* 57.  Hoffman was advised in writing that improvement was needed as a result of an incident in which he performed an MRI on a patient with a hearing aid:

> Areas Which Need Improvement: *Follow protocol on MRI risk patients*.
> Follow-up on patient phone call regarding wearing hearing aids during MRI exam. Was notified by patient that she had MRI on 3-23-11.  Hearing aid failed after scan and wanted to be reimbursed.  *Reviewed screening form and dentures and hearing aids were indicated. Patient states she was not asked to remove.  Reviewed with Harvey and he stated he did not notice hearing aids, informed Harvey to review all documents and tak[e] safety precautions prior to performing MRI exams*.

*Id.* (emphasis added).  In an April 13, 2011 e-mail, Rose reminded Hoffman and other radiology employees that an MRI should not be performed when a patient's MRI Screening Form contains any

references to contraindicators: "When a patient completes MRI questionnaire and *any field indicates a YES should call for a hard stop. This means that the exam should not be performed until patient is cleared by MRI staff or Radiologist*. For example, removal of metal items, hear[]ing devices, prosthesis, etc." *Id.* at 58 (emphasis added).

As a result of the October 28, 2011 incident and Hoffman's prior history of patient safety issues, Ramirez and Rose determined that Hoffman's employment should be terminated. On November 3, 2011, Ramirez and Rose met with Hoffman and notified him that his employment was being terminated. Zavala and Watkins were not disciplined in connection with the incident.

Approximately one year before Hoffman was fired, Baylor instituted an annual skills competency evaluation in which all radiology employees were tested regarding intravenous ("IV") performance procedures. Hoffman never failed to pass this annual test while employed. At some unspecified point in time before Baylor instituted the annual IV test, Rose commented to Hoffman that the hospital had received complaints from patients about his hand shaking while administering IVs. Hoffman explained that the tremor in his hand did not interfere with his ability to perform his job.

## IV. Age Discrimination Claim

### A. Legal Standard Applicable to ADEA Claims

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Unlike Title VII, the ADEA does not authorize an alleged mixed-motives age discrimination claim. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). Instead, a plaintiff bringing a disparate-treatment claim under the ADEA must prove that age was the "but-for" cause of the

challenged adverse employment action. *Id.*; *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010). It is therefore insufficient under the ADEA for a plaintiff to show that age was a motivating factor. *See Gross*, 557 U.S. at 175. "But-for" cause means the cause without which the challenged adverse employment action or event would not have occurred. *Leal v. McHugh*, 731 F.3d 405, 415 (5th Cir. 2013) (citation omitted).

A plaintiff may prove employment discrimination with either direct or circumstantial evidence. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994)). Plaintiff does not base his claims on direct evidence that Defendant discriminated against him; therefore, his case relies on circumstantial evidence.

The burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973), applies to ADEA cases based on circumstantial evidence of discrimination. *Jackson v. Cal Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010), *called into doubt on other grounds by Reed v. Neopost USA, Inc.*, 701 F.3d 434 (5th Cir. 2012). Both parties acknowledge that the *McDonnell Douglas* burden-shifting framework applies to Plaintiff's ADEA claim. For a prima facie case age discrimination claim, a plaintiff must show that: "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 455 (5th Cir. 2011); *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004)); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). In work-rule violation cases, a plaintiff "may establish a prima facie case by showing 'either that he did not violate the rule or that, if he did,

[employees outside the protected class] who engaged in similar acts were not punished similarly.'"[5]

*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)). To state a prima face case in this manner, the employee "must show that [employees outside the protected class] were treated differently under circumstances 'nearly identical' to [theirs]." *Id.* (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).

Once a plaintiff establishes a prima facie case, the defendant must set forth a legitimate, nondiscriminatory reason for the employment action it took against the plaintiff. *Machinchick*, 398 F.3d at 350. This is a burden of production, not persuasion, on the defendant's part, and it "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "If the [defendant] articulates a legitimate, non-discriminatory reason for the employment decision, the

---

[5] *But see O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (invalidating a court-imposed requirement that a plaintiff demonstrate that he was replaced by a worker younger than the ADEA protected class of employees over forty-years-old, because "[t]he fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age." (emphasis in original)). The court in *O'Connor* explained that a prima facie case requires "*evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion*," and "[i]n the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger." *Id.* at 312-313 (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977) (emphasis added by *O'Connor* )). "Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.* at 313. *See also Lawson v. Graphic Packaging Int'l Inc.*, No. 13-30205, 2013 WL 6510911, at *3 (5th Cir. Dec. 13, 2013) (unpublished) (concluding that the district court did not reversibly err when it admitted a withdrawn stipulation of the parties as to the age of the plaintiff's replacement at GPI, who was fifty-four years old, because "While it may be true that Lawson withdrew his stipulation and correspondingly never urged that his replacement's age was evidence of GPI's discriminatory conduct, . . . Engle's age, close in proximity to Lawson's, if properly admitted, would have been relevant evidence of GPI's lack of a motive to discriminate based on age.") (citing *O'Connor*, 517 U.S. at 313). As previously noted, Hoffman contends that he was treated differently than younger employees Zavala and Watkins, who were 49 and 55 when Hoffman was fired. As they were both over 40, Zavala, Watkins, fall within the same protected age group as Hoffman. Hoffman does not specifically address the significance of Zavala and Watkins being in the same protected class. He instead simply states that he "was a member of [a] protected class (over 40 years old)" because he was 70 years old when he was fired. Pl.'s Resp. 11 (citing *Morrison v. Weyerhaeuser Co.*, 119 F. App'x 581, 584 (5th Cir. 2004) (unpublished)). The court nevertheless assumes that Hoffman contends that, even though Zavala and Watkins are in the same protected age class, the age difference between them and him is sufficiently significant to create a genuine dispute as to whether Baylor discriminated against him because of his age.

plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual." *Moss*, 610 F.3d at 922. "In determining whether the plaintiff's rebuttal precludes summary judgment, '[t]he question is whether [the plaintiff] has shown that there is a genuine issue of material fact as to whether this reason was pretextual.'" *Id.* (citation omitted). Pretext may be shown "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Jackson*, 602 F.3d at 378-79 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (internal quotation marks omitted)).

## B.   The Parties' Contentions Regarding Plaintiff's ADEA Claim

Baylor contends that Hoffman cannot satisfy the fourth requirement for a prima facie case of age discrimination.  Baylor further contends that, even assuming that Hoffman can establish a prima facie case, it had a legitimate nondiscriminatory reason for terminating his employment and there is no evidence that its decision to terminate his employment was a pretext for discriminating against him because of his age.  Baylor asserts that it terminated Hoffman's employment because he failed to follow MRI protocol on October 28, 2011, and prior occasions, by not carefully reviewing the patient screening form for contraindicators before performing the MRI, and that the severity of the patient safety issues that occurred on October 28, 2011, necessitated the termination of his employment.

Hoffman counters that he has established a prima facie case.  With regard to the fourth requirement of a prima facie case, Hoffman contends that he was treated less favorably than employees significantly younger than he is because he was fired as a result of the October 28, 2011 incident while Zavala and Watkins were not disciplined.  According to Hoffman, Zavala and Watkins were equally culpable and should have also been disciplined because they also failed in their job duties.

**Memorandum Opinion and Order - Page 12**

Regarding Zavala, Hoffman contends that, as the attending nurse, she should have but failed to telephone Patient X's family about contraindicators, such as a pacemaker, before the MRI was conducted and failed to communicate verbally to him that Patient X had a pacemaker. Hoffman also asserts that Watkins failed in her job duties because she incorrectly told him that Patient X had been cleared for an MRI, although contraindicators were noted in her MRI Screening Form. Hoffman blames Zavala and Watkins for what happened and states in his declaration that he would not have proceeded with the MRI if they had informed him that Patient X had a pacemaker or had not been cleared for an MRI. Pl.'s App. 12-13.

In response to Baylor's contention that there is no evidence of pretext, Hoffman relies on the same evidence. Hoffman acknowledges that he initiated a medical procedure that endangered a patient's safety, but he contends that he was treated differently than younger employees Zavala and Watkins, who were not disciplined as a result of the October 28, 2011 incident. According to Hoffman, the October 28, 2011 incident was caused by several Baylor employees and an overall breakdown in the system or procedures routinely followed at Baylor for screening patients for MRIs:

> Here, it was the failure of several employees that led to the administration of an MRI on Patient X. First, the physician who ordered the MRI failed to fully assess the patient in ordering the MRI in the first place. Second, the patient's attending nurse, Paula Zavala, failed to assess properly the patient to clear her for an MRI. Third, Unit Clerk Debra Watkins incorrectly told Hoffman that the patient had been cleared for her MRI scan. Fourth, Zavala failed to tell Hoffman that the patient had a pacemaker when he came to retrieve the patient. And finally, Hoffman failed to check the form to ensure that the patient was cleared for an MRI scan.

Pl.'s Resp. 9.

Additionally, although Zavala and Watkins held different positions than did Hoffman, he contends that he is similarly situated for comparison purposes. Hoffman relies on *Coveney v. U.S. Bank Nat'l Ass'n*, No. 1:07-CV-706, 2008 WL 4332515 (S.D. Ohio Sept. 17, 2008), for the

proposition that employees need to be similarly situated, not identically situated, in determining whether they were treated differently.  Hoffman sets forth the factors in *Coveney* for similarly situated employees as follows: "(1) shared the same supervisor, (2) were subject to the same standards, and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Pl.'s Resp. 15 (quoting *Coveney*, 2008 WL 4332515, at *8).[6]  Hoffman contends that all of these factors are satisfied here because: (1) he was fired by Ramirez, a manager in the human resources department, which oversees all employees; and (2) he, Zavala, and Watkins "were all subject to the same in-patient procedure for MRI scans"; and (3) "[a]ll failed in their duties with regard to that procedure."  Pl.'s Resp. 15.  Hoffman asserts that he has created a genuine dispute of material fact as to whether Baylor's reason for firing him was a pretext for age discrimination because:

> the person responsible for terminating Hoffman's employment [Ramirez] was the same person with authority to discipline Zavala and Watkins, the three are similarly situated. Because Zavala and Watkins failed in their duties just the same as Hoffman did, their failures, while not "identical in every respect," were nonetheless "comparable in kind and severity." That Hoffman relied on Zavala and Watkins's investigation and reporting demonstrates the seriousness of Zavala and Watkins's failures. But again, Hoffman was terminated while neither Zavala nor Watkins was even disciplined.

*Id.* 14-15 (footnotes omitted).

In its reply brief, Baylor disagrees that Hoffman, Zavala, and Watkins are similarly situated and points to evidence that Zavala and Watkins: held different positions; were not supervised by Rose, the director of radiology; had different job duties and responsibilities that did not include evaluating a patient's history or symptoms to determine whether the patient was a good candidate for an MRI; and were not qualified to determine whether a patient could have an MRI.  Baylor also

---

[6] *Coveney* is not binding on this court and, the standard, as will be shown, is at odds with Fifth Circuit precedent.

presented evidence to show that at the time of the October 28, 2011 incident, Zavala and Watkins worked in Two North, whereas Hoffman worked in the MRI department, which is located in a different area and floor of the hospital. Baylor contends that although it was not Zavala's or Watkin's job to determine whether a patient was a good candidate for an MRI, the information regarding Patient X's pacemaker and other information Hoffman needed to do his job before performing the MRI was provided in writing to him in the patient's MRI Screening Form, and that he simply failed to review the form and act accordingly based on the available information.

### C.    Analysis Regarding Plaintiff's ADEA Claim

The court concludes that Hoffman cannot establish a prima facie case, and he has failed to come forward with evidence sufficient to raise a genuine dispute of material fact regarding pretext. Baylor carried its burden of coming forward with a legitimate nondiscriminatory reason for terminating Hoffman's employment, that is, Baylor asserts that Hoffman's employment as an MRI Tech was terminated because he failed on October 28, 2011, and prior occasions, to review carefully patient screening forms before performing MRIs, and Hoffman's conduct in this regard on October 28, 2011, could have caused Patient X's death. The burden therefore shifted to Hoffman to show pretext either through evidence of disparate treatment or showing that Baylor's proffered reason for terminating his employment is false or unworthy of credence.

As previously noted, Hoffman acknowledges that he failed to check Patient X's MRI Screening Form to ensure that the patient was cleared for an MRI scan but contends that Baylor discriminated against him based on his age because similarly situated younger employees, Zavala and Watkins, were not disciplined. With regard to pretext, Hoffman relies solely on evidence that Zavala and Watkins, younger employees, were not disciplined for their involvement in the incident that occurred on October 28, 2011. Hoffman, however, fails to address Baylor's evidence that he

committed the October 28, 2011 workplace violation despite being previously warned about failing to review carefully patient screening forms.  On the other hand, there is no evidence that Zavala and Watkins have a history of prior performance issues, let alone a history of workplace violations comparable in seriousness to those committed by Hoffman.  The circumstances surrounding their alleged violations are therefore distinguishable and not nearly identical to those of Hoffman.  As explained by the Fifth Circuit in *Lee v. Kansas City Southern Railway, Company*, 574 F.3d 253 (5th Cir. 2009), "[E]mployment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and *have essentially comparable violation histories*." *Id.* at 260 ( (footnotes omitted and emphasis added).

Accordingly, Hoffman's evidence is insufficient to establish a prima facie case of age discrimination.  For the same reason, the court concludes that Hoffman has failed to raise a genuine dispute of material fact that Baylor's reason for terminating his employment was pretextual.  Because of the different circumstances surrounding the alleged violations, Hoffman's evidence of alleged disparate treatment is not probative circumstantial evidence of pretext.  Baylor is therefore entitled to judgment as a matter of law on Hoffman's age discrimination claim.

## V.     Disability Discrimination Claim

### A.     Legal Standard Applicable to ADA Claims

The ADA is an antidiscrimination statute designed to remove barriers that prevent qualified individuals with disabilities from enjoying employment opportunities available to persons without disabilities. *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 161 (5th Cir. 1996). The ADA prohibits discrimination against a qualified individual because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job

training; and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).   A person is disabled under the ADA if he (1) has a physical or mental impairment that substantially limits one or more of the major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). The court must interpret this definition strictly. *Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 855 (5th Cir. 2010).

A person "may establish a claim of discrimination under the ADA either by presenting direct evidence or by using the indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999). To establish a prima facie case of intentional discrimination under *McDonnell Douglas*, based on circumstantial evidence, a plaintiff must show that he "(1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action, and (4) was replaced by a non-disabled person or treated less favorably than non-disabled employees." *Id.* The employer then "must show a legitimate, nondiscriminatory reason for its action." *Id.* If the employer articulates a legitimate nondiscriminatory reason for the adverse employment action, "the *McDonnell Douglas* burden-shifting framework falls away and the issue becomes discrimination *vel non*." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).   In considering whether the employer intentionally discriminated against the plaintiff, however, "evidence presented in the prima facie case and any evidence the plaintiff produces that tends to show that the employer's articulated reason for the adverse employment action was pretextual" may be considered.   *Id.*   "The employee ultimately bears the burden of showing that the employer's actions were motivated by considerations prohibited by the statute." *Seaman*, 179 F.3d at 300. To be actionable under the ADA, "discrimination need not be the sole reason for the adverse employment decision," but it must at least be a "motivating factor;" that is, the employee's disability "must actually play a role in the

employer's decision making process and have a determinative influence on the outcome." *Pinkerton v. Spellings*, 529 F.3d 513, 518-19 n.27, 34 (5th Cir. 2008) (quoting *Soledad v. United States Dept. of Treasury*, 304 F.3d 500, 503-04 (5th Cir. 2002)).

### B.    The Parties' Contentions Regarding Plaintiff's ADA Claim

Baylor contends that it is entitled to judgment as a matter of law on Hoffman's disability claim because he cannot establish the fourth requirement for a prima facie case of discrimination or pretext.  Hoffman contends that before he was terminated:

> Baylor had expressed a desire to eliminate [him] as an employee because it perceived his right hand tremor as rendering him unfit to work as a radiology technologist. Baylor even advised a test to see if [he] could properly start intravenous lines. Hoffman, however, never failed to pass the test.  Thus, when the MRI scan incident occurred [on October 28, 2011], Baylor used it as cover to terminate [his] employment.

Pl.'s Resp. 1, 18.  Hoffman further asserts that evidence that "White scolded Zavala for what happened to Patient X and consoled Hoffman" is proof that Zavala was to blame for the October 28, 2011 incident, not him.  Pl.'s Resp. 14 ("White's comments are evidence of Zavala's wrongdoing in not dispatching her duties as she should have, and a proper characterization of Hoffman's conduct: "accidents happen.").[7]  The parties' arguments regarding Hoffman's disability claim are otherwise substantially similar to those made with respect to his age discrimination claim.  Hoffman contends that he is disabled because of the tremor in his right hand and that he was treated differently than nondisabled employees Zavala and Watkins[8] because he was the only employee who was disciplined

---

[7] Accordingly to Hoffman's declaration, White was a "House Supervisor" at the time of the incident, and, as previously noted, she appears to have been the nursing supervisor on duty who was covering for Zavala's manager.

[8] Plaintiff also contends that he was treated differently than an employee named "Davis"; however, as noted by Baylor, there is no other reference or information in Plaintiff's pleadings or the summary judgment record regarding an employee named "Davis."  *See* Pl.'s Resp. 16.  The reference to "Davis" therefore appears to be inadvertent.

**Memorandum Opinion and Order - Page 18**

as a result of the October 28, 2011 incident.  The parties also dispute whether Zavala and Watkins are appropriate comparators.

**C.     Analysis Regarding Plaintiff's ADA Claim**

In support of his ADA claim, Hoffman relies on the deposition testimony of Stokes, Zavala, and Watkins, and his declaration to show that Zavala and Watkins also committed workplace violations with respect to the October 28, 2011 incident but were not disciplined, and Baylor's reason for firing him was a pretext for disability discrimination.  For the reasons that follow, the court concludes that Hoffman's evidence of disparate treatment is insufficient to establish the fourth requirement of a prima facie case – that he was treated less favorably than nondisabled employees – and creates only a "weak issue" of fact as to whether Baylor's proffered reason for terminating his employment was a pretext for intentional discrimination based on his disability.  *See Reeves*, 530 U.S. at 148 (holding that judgment as a matter of law is proper when a plaintiff creates only a weak issue of fact as to the employer's stated reason for the employment decision and there is uncontroverted independent evidence that discrimination did not take place).

> 1.     *Hoffman's evidence that Zavala and Watkins failed to perform their job duties*

As previously noted, Hoffman contends that Zavala was required as the attending nurse but failed to: (1) contact Patient X's family before the MRI was conducted to verify the presence of contraindicators, such as a pacemaker; and (2) failed to verbally inform him that Patient X had a pacemaker before the MRI was conducted.  Regarding Watkins, Hoffman contends that she incorrectly told him Patient X had been cleared for an MRI.  Hoffman does not dispute that he failed to check Patient X's MRI Screening Form to ensure that she was cleared for an MRI scan; nor does he dispute that he was warned in the past for similarly failing to review patient screening forms

before conducting MRIs.  Hoffman instead relies on evidence that Zavala and Watkins (nondisabled employees) played a role in the October 28, 2011 incident but were not disciplined.  As previously explained, however, there is no evidence that Zavala and Watkins have a similar history of prior performance issues, let alone a history of similarly serious performance issues.  The circumstances surrounding their alleged violations are therefore not nearly identical to the circumstances surrounding Hoffman's violation.

Moreover, even when viewed in the light most favorable to Plaintiff, the summary judgment record taken as a whole does not support his contention that Zavala and Watkins similarly failed to perform their job duties.  At most, Hoffman's declaration and the deposition testimony that he relies on merely establish that the nursing staff and other hospital employees would typically assist the MRI Techs in an effort to be helpful, not because they were required to do so as part of their job duties.  Hoffman states in his declaration that nurses and nurse station employees routinely performed certain MRI patient screening tasks.  Hoffman further states that attending nurses "*should* tell MRI Techs about any contraindicators they find.*"* Pl.'s App. 10-11 (emphasis added).  Evidence of what nurses and clerks frequently did or should do, however, is not evidence of what Zavala and Watkins were required to do as part of their job duties.  While it is commendable that nurses or nursing station clerks would routinely assist the MRI Tech, this evidence does not establish that Zavala and Watkins were required to perform such tasks as part of their nursing or clerking job duties or that they would be subject to discipline if they failed to or incorrectly performed the tasks.  Hoffman's counsel recognized this distinction when deposing Stokes, Zavala, and Watkins.

Hoffman also states that because Patient X was unable to speak, "Hospital employees were thus *required* to check with her relatives to determine if she could have an MRI." *Id.* at 11

**Memorandum Opinion and Order - Page 20**

(emphasis added).[9]  Hoffman does not specify who all is included in his reference to "[h]ospital employees," but it appears from other statements in his declaration that he is referring to the attending nurse:

> e.  The attending nurse completes the form based on information derived from the patient's answers to questions if they are capable of speaking.
>
> f.  If the patient cannot speak, the attending nurse is to ask relatives, whether in person or by phone.
>
> g.  If the patient is admitted overnight, the day nurse on duty is to call relatives to obtain the necessary information to complete the MRI [Screening Form].

*Id.* at 10.  According to Hoffman's declaration, his only role with regard to MRIs was to transport patients to the MRI examination area and conduct the MRIs.  These declaration statements by Hoffman regarding his job duties and the attending nurse's job duties, however, are inconsistent with his job description and Baylor's written safety procedures for screening MRI patients, which he has acknowledged apply to him.

Even assuming that Zavala and Watkins were required to but failed to perform or made mistakes, their alleged errors were not of the magnitude of the error made by Hoffman.  Whether Zavala telephoned Patient X's family to determine whether she had a pacemaker or other contraindicators is of no moment because Stokes and Zavala were able to complete the MRI Screening Form using information in Patient X's chart, and the presence of a pacemaker was clearly indicated on both pages of the screening form completed by Zavala.  Thus, there was no need for Zavala to contact Patient X's family.

---

[9] Notably, this is the only time Hoffman uses the word "required" in his declaration, even though he relies heavily on his declaration to support his position that Zavala and Watkins were required to perform certain tasks.  Other than this reference to "required," Hoffman chooses his words quite carefully to describe what he perceived to be a routine practice at the hospital for screening patients without directly stating that Zavala and Watkins, as an attending nurse and unit clerk, were *required* to perform certain tasks.

Further, as aptly noted by Watkins, even if a nurse should know that a patient with a pacemaker cannot have an MRI,  there was no reason for Zavala to communicate this fact to Hoffman verbally because, again, the information regarding Patient X's pacemaker was included in her MRI Screening Form and clearly set forth on *both* sides of the form.  Hoffman simply failed to review the MRI Screening Form before conducting the MRI and instead relied on what Watkins told him about Patient X being cleared, even though he knew Watkins had no professional or medical training.  Def.'s App. 30; *see also* Pl.'s App. 12 ("Had Watkins not told me that Patient X had been cleared, I would not have proceeded with the procedure.").  It is astounds the court that Hoffman, as a trained MRI Tech and the person *ultimately* responsible for confirming that Patient X had been cleared for an MRI, would have assumed, based on what Watkins told him, that the patient had in fact been cleared without first carefully reviewing her MRI Screening Form.

As the MRI Tech, Hoffman had the ultimate responsibility, according to his job description and Baylor's written MRI protocol, to ensure that a patient had been cleared before performing an MRI.  What Zavala or Watkins failed to do is quite beside the point because had Hoffman simply read Patient X's chart and the MRI Screening Form as required, *he would not have performed the MRI scan, and no risk of harm to Patient X would have occurred*.  Rather than accept responsibility, Hoffman continues to "pass the buck," notwithstanding Baylor's written job description for his position and protocol for MRIs. Regardless of Hoffman's efforts to shift the blame, "The buck stopped" with him.  Based on the facts and circumstances of this case, the court concludes as a matter of law that Zavala and Watkins were not equally culpable as Hoffman contends.

>   2.   *Evidence regarding Carol White's comments during the meeting following the October 28, 2011 incident*

Hoffman relies on the following statements in his declaration as evidence of Zavala's alleged failure to dispatch her duties as attending nurse and to downplay his own failure to review Patient X's MRI Screening Form before performing the MRI:

44.   Zavala, Watkins, Summerville, House Supervisor White, ICU manager Cay Kubin, and I all gathered at the nurse's station at Two North and discussed what happened to Patient X.

45.   White scolded Zavala, saying "Paula, you know a patient with a pacemaker can't have an MRI."

46.   Zavala denied any responsibility, crying, "Oh no, you're not gonna hang this on me!"

47.   I told Zavala that I had called up to Two North and asked if the patient had been cleared for her MRI.

48.   Zavala refuted this and asked Watkins what I had said.

49.   Watkins replied that I had asked whether the patient had been cleared.

50.   White told me that "accidents happen," and that "it [was] going to be okay."

Pl.'s App. 13.   Baylor did not object to these statements in Hoffman's declaration.   The court nevertheless concludes that, except for Hoffman's statement in paragraphs 44 and 46, the above statements constitute inadmissible hearsay because they are out of court statements offered for the truth of the matter asserted.   Fed. R. Evid. 801(c).   Further, no predicate has been shown that they are not hearsay or that they fall within one of the numerous exceptions to hearsay.   As such, the statements are not competent summary judgment evidence, and the court cannot consider them in ruling on Baylor's summary judgment motion.   *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991) (explaining that evidence that is inadmissible at trial may not be used for summary judgment).   Moreover, none of these statements is relevant to the dispositive issues of this case.

**Memorandum Opinion and Order - Page 23**

    3.    *Evidence regarding IV test instituted one year before Hoffman was fired and Rose's statement to Hoffman regarding patient complaints*

As evidence that Baylor's proffered reason was a pretext for discrimination, Hoffman relies on his declaration in which he states: "About a year before my termination, Baylor instituted an annual venipunture performance test for radiology employees, but not for registered nurses. Prior to the testing requirement, Ronny Rose made comments to me about patients who complained about by tremor." Pl.'s App. 9. According to Hoffman, this is evidence that "Baylor . . . expressed concern at the symptoms of [his] disability and even took the additional step to implement a testing requirement aimed squarely at [his] symptoms." Pl.'s Resp. 18.

There is no evidence as to when Rose informed Hoffman that patients had complained about his tremor in performing IVs or how close in time the comment was made before the IV performance test was instituted. The mere fact that Rose's comment occurred at some unspecified time before the IV performance test was instituted creates only a weak issue as to whether the test was instituted as a result of patient complaints about Hoffman's tremor. More importantly, regardless of whether the two events were related, Rose's comment does not evince discriminatory animus and is therefore insufficient to create a genuine dispute of material fact as to whether Hoffman's disability played a role in Baylor's decision to terminate his employment, as it is merely a statement of fact that patients had complained about Hoffman's tremor while performing IVs. *Reed*, 701 F.3d at 441.[10] Hoffman

---

[10] In *Jackson v. Cal-Western Packaging Corporation*, the Fifth Circuit explained that this circuit's stray remark doctrine survived the Supreme Court's decision in *Reeves* but that the doctrine should be viewed cautiously after *Reeves*. *Jackson*, 602 F.3d at 380 n.27. In *Reed*, however, the court clarified that when "a plaintiff offers remarks as circumstantial evidence alongside other alleged discriminatory conduct," courts apply the more flexible two-part test in *Russell v. McKinney Hospital Venture*, 235 F.3d 219 (5th Cir. 2000), rather than the four-part test for stray remarks in *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996). *Reed*, 701 F.3d at 441. Under the flexible two-part test, "a plaintiff need only show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Id.* Here, Hoffman does not state whether his evidence regarding Rose's remarks is direct or circumstantial evidence but acknowledges that the *McDonnell Douglas* framework applies to his disability discrimination claim. The court therefore applies the two-part test in *Russell* but notes that Rose's remark regarding patient complaints is insufficient under either

acknowledged as much in his deposition when he testified that Baylor had a record of at least one patient complaint about his tremor, Def.'s App. 30, and he does not dispute that Baylor received similar complaints from other patients.  Accordingly, Rose's decision to convey this information to Hoffman, without more, is not evidence of discriminatory animus.

Moreover, although Rose was involved in the decision to terminate Hoffman's employment, he was also the person who convinced Hoffman to accept employment at Baylor's Waxahachie location. As a result, an inference arises that Baylor's decision to terminate Hoffman's employment was not motivated by discrimination. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 n.16 (5th Cir. 2000) ("The 'same actor' inference arises when the individual who allegedly discriminated against the plaintiff was the same individual who hired the plaintiff and gives rise to an inference that discrimination was not the motive behind plaintiff's termination.").

The court also fails to see how requiring all radiology employees, but not nurses, to take an annual IV performance test is evidence of that Hoffman was treated differently than nondisabled employees or that his disability was a motivating factor in Baylor's decision to terminate his employment, particularly since he does not contend that IV competency was a new job requirement or skill required of MRI Techs or radiology employees. Regardless of whether an employee is disabled, he must still be able to perform the job for which he was hired, and it is not unreasonable for an employer to expect that an employee be able to perform his job duties.  Thus, an employer's efforts in ensuring that an employee is capable of performing his job, without more, is not evidence of disparate treatment or intentional discrimination, and Hoffman's unsubstantiated assertions to the contrary are inadequate to satisfy his burden as the nonmovant.

---

test to raise a genuine dispute of material fact.

Accordingly, neither the performance test nor Rose's comments support Hoffman's contention that "Baylor had expressed a desire to eliminate [him] as an employee because it perceived his right hand tremor as rendering him unfit to work as a radiology technologist," and that "Baylor had expressed a desire to eliminate [him] as an employee because it perceived his right hand tremor as rendering him unfit to work as a radiology technologist." Pl.'s Resp. 1, 18. Hoffman, rather than come forth with competent summary judgment evidence, simply has a subjective belief, surmises, or speculates that Zavala and Watkins were treated more favorably than he was because of his disability. "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) (citations omitted). "It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason." *Id.* at 1430 (citations omitted). The court therefore concludes, for all of aforementioned reasons, that Hoffman has failed to raise a genuine dispute of material fact that he was treated less favorably than nondisabled employees or his disability was a motivating factor or played a role in Baylor's decision to terminate his employment. Baylor is therefore entitled to judgment as a matter of law on Hoffman's disability discrimination claim.

## VI.    Evidentiary Objections

Baylor contends that certain statements in Hoffman's declaration should be stricken because they are conclusory and speculative. Hoffman did not respond to Baylor's objections. The court has only considered evidence that is admissible pursuant to Rule 56 of the Federal Rules of Civil Procedure and the summary judgment standard herein enunciated. Moreover, Hoffman's age and

disability discrimination claims fail as a matter of law regardless of whether the court considers the evidence objected to by Baylor.  The objections are therefore **overruled** as **moot**.

## VII.    Conclusion

For the reasons herein stated, the court concludes that no genuine dispute of material fact exists regarding Plaintiff's claims for age discrimination under the ADEA or disability discrimination under the ADA.  Defendant is therefore entitled to judgment as a matter of law on these claims.  Accordingly, the court **grants** Defendant Baylor Health Care System's Motion for Summary Judgment (Doc. 17) and **dismisses with prejudice** this action. Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

**It is so ordered** this 27th day of February, 2014.

Sam A. Lindsay
United States District Judge